Trenton R. Kashima (SBN No. 291405)
tkashima@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
280 S. Beverly Drive, Ste. PH
Beverly Hills, CA 90212
Tel: (619) 810-7047

*Attorney for Plaintiff Lucinda O'Dea and the Proposed Class*

[Additional Counsel for Plaintiffs After the Caption]

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUCINDA O'DEA, GEORGE TERON, EFREN RAMOS, JOSHUA CROSS, MARISOL SCHARON, JAMIE HEERMANN, BIANCA JACKSON, COLE SCROGGS, and JORDAN JUDT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALCHEMEE, LLC and TARO PHARMACEUTICALS U.S.A., INC.,<br><br>Defendants. | Case No.: 2:24-cv-07049-SB-BFM<br><br>**PLAINTIFFS' CONSOLIDATED SECOND AMENDED COMPLAINT**<br><br>Judge: Hon. Stanley Blumenfeld, Jr. |

Nick Suciu, III (admitted *pro hac vice*)
nsuciu@milberg.com
Alex R. Strauss (SBN No. 321366)
astraus@milberg.com
J. Hunter Bryson (admitted *pro hac vice*)
hbryson@milberg.com
Luis Angel Cardona (admitted *pro hac vice*)
lcardona@milberg.com
Russell Busch (admitted *pro hac vice*)
rbusch@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
280 S. Beverly Drive, Ste. PH
Beverly Hills, CA 90212
Tel: (619) 810-7047

*Attorneys for Plaintiff Lucinda O'Dea and the Proposed Class*

Philip L. Fraietta (SBN No. 6337165)
**BURSOR AND FISHER P.A.**
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646)-837-7150
pfraietta@bursor.com

*Attorney for Plaintiff Lucinda O'Dea and the Proposed Class*

Stephanie Sherman, Esq. (SBN: 338390)
ssherman@wisnerbaum.com
R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@wisnerbaum.com
**WISNER BAUM LLP**
11111 Santa Monica Blvd, Suite 1750
Los Angeles, CA 90025
Tel: (310) 207-3233

*Attorneys for Plaintiffs Efren Ramos, Joshua Cross, Marisol Scharon and the Proposed Classes*

Mark S. Reich (*pro hac vice* to be filed)
mreich@zlk.com
Courtney E. Maccarone (*pro hac vice* to be filed)
cmaccarone@zlk.com
Melissa Meyer (*pro hac vice* to be filed)
mmeyer@zlk.com
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10006
Telephone: 212-363-7500

*Attorneys for Plaintiff Jordan Judt and the Proposed Class*

R. Jason Richards (admitted *pro hac vice*)
**AYLSTOCK, WITKIN, KREIS, & OVERHOLTZ PLLC**
17 East Main Street, Suite 200

Pensacola, FL 32502
Tel: 850-202-1010
jrichards@awkolaw.com

*Attorney for Plaintiffs George Teron, Jamie Heermann, Bianca Jackson, Cole Scroggs and the Proposed Class*

Thomas P. Cartmell (admitted *pro hac vice*)
tcartmell@wcllp.com
Melody R. Dickson (admitted *pro hac vice*)
mdickson@wcllp.com
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel. (816) 701-1100

*Attorneys for Plaintiffs Jamie Heermann, Bianca Jackson, Cole Scroggs and the Proposed Class*

Kiley Lynn Grombacher (SBN No. 245960)
**BRADLEY GROMBACHER LLP**
31365 Oak Creek Drive, Suite 240
Westlake Village, CA 91361
Tel: (805) 270-7100
kgrombacher@bradleygrombacher.com

*Attorney for Plaintiffs George Teron, Jamie Heermann, Bianca Jackson, Cole Scroggs and the Proposed Class*

Lucinda O'Dea, George Teron, Jamie Heermann, Bianca Jackson, Cole Scroggs, Efren Ramos, Joshua Cross, Marisol Scharon, and Jordan Judt (collectively "Plaintiffs"), individually, and on behalf of all others similarly situated, by and through their attorneys, makes the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge, against Defendants Alchemee, LLC ("Alchemee") and Taro Pharmaceuticals U.S.A., Inc. ("Taro") (collectively, "Defendants"):

## I. INTRODUCTION

1. This is a class action lawsuit regarding Defendants' manufacturing, distribution, advertising, marketing and sale of over-the-counter ("OTC") Proactiv-branded acne treatment products that contain the active ingredient benzoyl peroxide ("BPO") (the "Products"). These Products are marketed as safe, effective, and legal method of mitigating acne, intended for topical use. However, the Products contain an unacceptable level of benzene.

2. Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years.

3. Benzene is a well-known human carcinogen (linked to leukemia and other cancers), which is not permitted to be used in pharmaceutical products, unless absolutely unavoidable. And even then, only in trace amounts. This is because there is no safe level of exposure of benzene.

4. Feasible alternative formulations, designs and materials, such as including antioxidants, were available to Defendants at the time the Product was formulated designed, and manufactured, to prevent and/or inhibit the formation of

benzene in the Products. Additionally, benzene contamination can be controlled through the application of appropriate quality control and manufacturing standards, for example appropriate temperature controls and testing protocols. Yet, Defendants failed to test for, detect, or prevent the Products from containing benzene or forming benzene in its manufacturing, processing, packing, and holding of the Products, and Plaintiffs and consumers were harmed as a result of Defendants' failures.

5. Benzene is restricted by the FDA to 2 ppm where its use in manufacturing "is unavoidable in order to produce a drug product with a significant therapeutic advance."[1] Except in such "limited cases," Class 1 solvents such as benzene should not be employed in the manufacture of drug substances or drug products "because of their unacceptable toxicity."[2]. The Products are not designed to contain benzene, and the use of benzene in the manufacturing process is not "unavoidable." Thus, the presence of benzene in the Products renders them adulterated and misbranded, and therefore illegal to sell under both federal and state law. Nonetheless, Defendant's Products do not meet even the more permissible 2 ppm standard.

6. Additionally, Defendants' production of Products violates Federal law which requires minimum levels of quality control, in manufacturing OTC drugs, and if these requirements were followed, the adulterated Products should have never been sold.

7. Given that Defendants put adulterated, and therefore dangerous Products into the marketplace, it further renders the Products unfit for their particular use, and not of merchantable quality.

---

[1] 2018 ICH Q3C guidance, at p. 5. US FDA, June 2017 (available at https://www.fda.gov/media/71737/download).

[2] *Reformulating Drug Products That Contain Carbomers Manufactured With Benzene*; Guidance for Industry – Final Guidance. US FDA, December 27, 2023 (citing 2018 ICH Q3C guidance at p. 5) (available at https://www.regulations.gov/document/FDA-2023-D-5408-0002).

8. Because the Products are unsafe and illegal to sell under federal law, they are worthless. *See* 21 U.S.C. §§ 331(a), 352; *see also Barnes v. Unilever United States Inc.*, 2022 WL 2915629, at *1-3 (N.D. Ill. July 24, 2022); *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021). Consumers have been undoubtedly injured by Defendants' practices.

9. Accordingly, Plaintiffs bring this class action to recover damages and restitution from Defendants' unlawful and unfair business practices, and seeks injunctive relief to prevent future harm.

## II. <u>PARTIES</u>

### A. Plaintiffs

10. Plaintiff Lucinda O'Dea is a resident and citizen of Berwyn, Illinois. Approximately three years ago, Plaintiff O'Dea purchased and used Defendants' Products, including the Proactiv 2.5% BPO Cream and Defendants' Proactiv 5% BPO Cream from a CVS store in Chicago, Illinois. When purchasing the Product, Plaintiff O'Dea reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendants that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell. Plaintiff O'Dea relied on these representations and warranties in deciding to purchase the Product manufactured and sold by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendants if she had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell.

11. Plaintiff O'Dea will purchase the Products in the future, if she could be assured that the Products did not contain unsafe levels of benzene.

12. Plaintiff Jamie Heermann is a resident and citizen of Lee's Summit, Missouri. Over the past two years, For approximately the past 15 years, up to and

including 2024, Plaintiff Heermann has purchased Defendants' Products, including the Proactiv® 2.5% cream from various retail outlets such as Walmart, Target and Ulta Beauty in Lees Summit, Missouri. When purchasing the Product, Plaintiff Heermann reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendants that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell. Plaintiff Heermann relied on these representations and warranties in deciding to purchase the Product manufactured and sold by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendants if she had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell.

13. Plaintiff Heermann will purchase the Products in the future, if she could be assured that the Products did not contain unsafe levels of benzene.

14. Plaintiff George Teron is a resident and citizen of Milpitas, California. From approximately 1997 through 2024, Plaintiff Teron purchased Defendants' Products, including Proactiv Repair acne treatment, directly from Defendants at Proactiv.com, from Amazon.com, and from various other online retailers. When purchasing the Product, Plaintiff Teron reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendants that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell. Plaintiff Teron relied on these representations and warranties in deciding to purchase the Product manufactured and sold by Defendants, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Product from Defendants if he had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell. Plaintiff Teron will purchase the Products in the future, if he could be assured that the

Products did not contain unsafe levels of benzene.

15. Plaintiff Bianca Jackson is a resident and citizen of St. Louis, Missouri. From 2004 to approximately 2019, Plaintiff Jackson purchased Defendants' Products, including the Proactiv® 2.5% cream from Defendants' proactiv.com website. When purchasing the Product, Plaintiff Jackson reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendants that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell. Plaintiff Jackson relied on these representations and warranties in deciding to purchase the Product manufactured and sold by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendants if she had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell.

16. Plaintiff Jackson will purchase the Products in the future, if she could be assured that the Products did not contain unsafe levels of benzene.

17. Plaintiff Cole Scroggs is a resident and citizen of St. Louis, Missouri. From 2004 to approximately 2019, Plaintiff Scroggs purchased Defendants' Products, including the Proactiv® 2.5% cream from Defendants' proactiv.com website. When purchasing the Product, Plaintiff Scroggs reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendants that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell. Plaintiff Scroggs relied on these representations and warranties in deciding to purchase the Product manufactured and sold by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendants if she had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not

adulterated and misbranded, and legal to sell.

18. Plaintiff Jackson will purchase the Products in the future, if she could be assured that the Products did not contain unsafe levels of benzene.

19. Plaintiff Jordan Judt is a resident and citizen of Madison County, Nebraska. In November 2023, Plaintiff Judt purchased one of Defendants' Products, including the Proactiv® Solution 3-Step Routine, from a Target retail store located in Norfolk, Nebraska. When purchasing the Product, Plaintiff Judt reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendants that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell. Plaintiff Judt relied on these representations and warranties in deciding to purchase the Product manufactured and sold by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendants if she had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell.

20. Plaintiff Judt will purchase the Products in the future, if she could be assured that the Products did not contain unsafe levels of benzene.

21. Plaintiff Efren Ramos is a resident and citizen of Union City, California. From 2017 to 2024, Plaintiff Ramos purchased and used Defendants' Products, including the Proactiv Renewing Cleanser. When purchasing the Product, Plaintiff Ramos reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendants that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell. Plaintiff Ramos relied on these representations and warranties in deciding to purchase the Product manufactured and sold by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendants if he had

known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell.

22. Plaintiff Ramos will purchase the Products in the future, if he could be assured that the Products did not contain unsafe levels of benzene.

23. Plaintiff Joshua Cross is a resident and citizen of San Francisco, California. From 2002 to 2023, Plaintiff Cross purchased and used Defendants' Products, including the Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution® Repairing Treatment, Proactiv Solution Renewing Cleanser, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief. When purchasing the Product, Plaintiff Cross reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendants that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell. Plaintiff Cross relied on these representations and warranties in deciding to purchase the Product manufactured and sold by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendants if he had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell.

24. Plaintiff Cross will purchase the Products in the future, if he could be assured that the Products did not contain unsafe levels of benzene.

25. Plaintiff Marisol Scharon is a resident and citizen of San Pedro, California. From 2002 to 2023, Plaintiff Scharon purchased and used Defendants' Products, including the Proactiv Solution Repairing Treatment, Proactiv Solution® Renewing Cleanser, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief. When purchasing the Product, Plaintiff Scharon reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendants that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.

Plaintiff Scharon relied on these representations and warranties in deciding to purchase the Product manufactured and sold by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendants if she had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell.

26. Plaintiff Scharon will purchase the Products in the future, if she could be assured that the Products did not contain unsafe levels of benzene.

27. The Products that Plaintiffs purchased were worthless because they either contained unsafe levels of benzene and were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell. Accordingly, the Plaintiffs were injured in fact and lost money as a result of Defendants' deceptive and unfair conduct.

**B. Defendants**

28. Defendant Alchemee LLC is a Delaware limited liability company with its principal place of business in Hawthorne, New York. Alchemee LLC was formerly known as The Proactiv Company.

29. 18. Defendant Taro Pharmaceuticals U.S.A., Inc. is a New York corporation with its principal place of business in Hawthorne, New York. Taro is the parent company of Defendant Alchemee LLC.

30. Collectively, Defendants sell and distribute Products under the brand name Proactiv. Defendants sell the Products throughout the United States, including in the States of Illinois, Missouri, Nebraska, and California. The Products, including those purchased by Plaintiffs and Class Members, are available at various retail stores throughout the United States, including in the States of Illinois, Missouri, Nebraska, and California.

31. Defendants authorized the manufacture, distribution, and sale of the Products.

## III. JURISIDICTION AND VENUE

32. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

33. This Court has personal jurisdiction over Defendants because this action arises out of and relates to Defendants' contacts with this forum. Specifically, Defendants knowingly placed the Products into the stream of commerce directed into this District. Defendants have advertised and marketed within this District through the wires and mail and via e-commerce websites through which residents of this state and District can purchase the Product. Further, Defendants knowingly directs electronic activity into this state and District with the intent to engage in business interactions and has in fact engaged in such interactions. Moreover, Defendants makes the Products available at retailers throughout this District.

34. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District, Defendants have caused harm to Plaintiffs and other Class members in this District, and otherwise have purposefully availed themselves of the markets in this District, through the promotion, sale, and marketing of the Products in this District.

## IV. FACTUAL ALLEGATIONS

### A. Defendants' Products

35. Fifty million Americans suffer from acne yearly.[3] Acne is the most common skin condition in the U.S. with a prevalence among adolescents of almost

[3] American Association of Dermatology, https://www.aad.org/media (visited October 24, 2023).

95 percent.[4] Acne can begin as early as age seven and, for some, can persist through adulthood and into ages 50s and 60s.[5] Millions of acne sufferers seek treatment every year making it a billion-dollar industry.

36. Defendants own, manufacture, distribute, and retail the "Proactiv" brand products. Proactiv specializes in skincare products, including facial scrubs and washes, creams and lotions, and toners. Proactiv's products treat conditions like acne and breakouts. To stand out against their competitors, Defendants market themselves as a trusted brand, which produces safe and effective products.

37. Defendants market and sell BPO-containing acne treatment products as part of their acne treatment product lines. These products include, but are not limited to, the Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution Repairing Treatment, Proactiv Solution Renewing Cleanser, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief. As such, it is an ingredient intended for use in the manufacture of the Products.

38. The Products are marketed as a safe and effective OTC acne treatment, which can be sold as such. Defendants do not disclose that the Products contain unacceptable and harmful levels of benzene, which renders the Products adulterated and illegal to sell. By marketing the Products as OTC drugs, Plaintiffs and other Class members reasonably assume that they meet minimum federal safety criteria and are manufactured in compliance with U.S. Food and Drug Administration ("FDA") requirements for such products. *Corbett v. PharmaCare U.S., Inc.*, 567 F. Supp. 3d 1172, 1199 (S.D. Cal. 2021) ("Advertising a product as a "dietary supplement" creates a reasonable impression to the consumer that it has been designated or has features of a supplement based on some criteria set by the FDA."). Additionally, Plaintiffs and other Class members further reasonably assumed the

---

[4] JL Burton et al., *The prevalence of acne vulgaris in adolescence*, 85(2) BR J DERMATOL 119–126 (1971).

[5] *Id*.

Products would be manufactured to minimum standards established within the industry, pass without objection in the trade under the contract description, and are fit for the ordinary purposes for which such goods are used.

39. Defendants are responsible for the information included on the Products' labels, and in the marketing material for the Products.

40. As the manufacturer and distributor of the Proactiv products, Defendants have a duty to ensure that it complies with Current Good Manufacturing Practice ("CGMP") regulations and ensure its Products meet minimum safety standards.

41. The CGMP regulations for drugs contain minimum requirements for the methods, facilities, and controls used in manufacturing, processing, packing and holding of a drug product. The regulations ensure that a product is safe for use, and that it has the ingredients, to their respective degrees of strength, it claims to have. Accordingly, the CGMP regulations represent the minimum quality controls required in the industry.

42. All of Defendants' Products are manufactured in the same manner during the relevant time period. The Products contained the same material information on their labels during the relevant time period.

43. All lots of Defendants' Products contain benzene and/or systematically degrade to include benzene by the time they are released to consumers. As referenced below, this allegation is supported by testing conducted by Valisure LLC ("Valisure") on sixty-six acne treatment products containing benzoyl peroxide, all of which tested positive for benzene at various levels. Plaintiffs' independent testing confirms the same-that the Products contain excessive and harmful levels of benzene.

**B. The Dangers of Benzene**

44. The health hazards of benzene have been recognized for over one hundred years, and the scientific and regulatory communities are in agreement that

it is a known human carcinogen with severe consequences to human exposure. The World Health Organization ("WHO") recognizes that, "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and hematological effects."[6] WHO specifically outlines that, "[b]enzene is a genotoxic carcinogen in humans and no safe level of exposure can be recommended."[7]

45. A toxicity assessment by the Centers for Disease Control ("CDC") and Prevention shows benzene can harm the central nervous system and may affect reproductive organs.[8] The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells." The CDC also cautions that "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."

46. As stated by Dr. Christoper Bunick, MD, PhD, Associate Professor of Dermatology at Yale University, in Valisure's citizen petition:

> I want to reiterate first and foremost that there is not a safe level of benzene that can exist in any skin care product, over the counter or prescription. Benzene is highly carcinogenic, and recently we've seen the U.S. Food and Drug Administration agree with this position this by taking action to ensure removal of carbomers contaminated with benzene from manufacturing processes. The current data on BPO degrading into high levels of benzene is extremely concerning given its prominent use in skin care, and this study should serve as another wake-up call for improved manufacturing and quality control of

---

[6] https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2.

[7] WHO Guidelines for Indoor Air Quality: Selected Pollutants (2010); *see also* WHO, 2019. Preventing disease through healthy environments: Exposure to benzene: a major public health concern. World Health Organization (WHO), available at https://iris.who.int/bitstream/handle/10665/329481/WHO-CED-PHE-EPE-19.4.2-eng.pdf?ua=1 ("Benzene is carcinogenic to humans, and no safe level of benzene can be recommended.").

[8] https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf.

consumer healthcare products.[9]

47. According to the National Cancer Institute, "[e]xposure to benzene increases the risk of developing leukemia and other blood disorders."[10]

48. According to the National Toxicology Program, benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[11]

49. Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC"). Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[12] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[13]

50. The FDA also recognizes that "[b]enzene is a carcinogen that can cause cancer in humans"[14] and classifies benzene as a "Class 1" solvent that should be

[9] Valisure Citizen Petition, March 5, 2024 at 28-29, available at https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf.

[10] https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[11] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis in original).

[12] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.

[13] *Id*. at 34.

[14] https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages#q1.

"avoided" in drug manufacturing.[15] FDA guidance provides: "Solvents in Class 1 [e.g. benzene] should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."[16] Only, if "unavoidable," may a drug product contain 2 ppm of benzene.[17] The FDA has been clear that "[m]anufacturers should not use benzene in the manufacture of drugs" and that "[d]rug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm, consistent with the recommendations described in the ICH Q3C guidance."[18] Accordingly, Accordingly, the FDA has been clear, it considers benzene contamination above 2 ppm to render any drug adulterated.

51. This FDA standard is not novel, it is adopted from the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use ("ICH") guidance for industry Q3C Impurities: Residual Solvents, which makes recommendations as to what amounts of residual solvents are considered safe in pharmaceuticals.[19] Accordingly, both at the federal and international level, it is recognized that benzene should not be in pharmaceuticals, and is only expectable at 2 ppm when "unavoidable." Within the pharmaceutical industry, a drug with over 2 ppm benzene is simply unacceptable under any circumstances.

52. On April 18, 2018, the FDA issued a Health Hazard Evaluation on two over-the-counter topical pain relievers containing benzene. The evaluation sought to assess "the risks associated with the application of the products [at issue] with levels

---

[15] https://www.fda.gov/media/71737/download.

[16] *Id.*

[17] *Id.*

[18] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs

[19] https://www.fda.gov/media/71737/download.

of benzene ranging between 8 ppm to 60 ppm."[20] In its evaluation, the FDA cited the ICH Q3C guidance document in observing that benzene is a solvent listed in the guidance documents as Class 1 and as a human carcinogen. It further noted that "[i]t is unacceptable for the amount of benzene to be more than 2 ppm in this product. The main targets of targets of benzene are the nervous system and the blood forming organs with clinical manifestations occurring years after exposure."[21] The FDA concluded that it is "possible that an individual after repeated exposure to this product [at the levels assessed] could experience increased cancer risk from its use."[22] In describing the "degree of the health hazard associated with use of the product by the population most likely to use it," the FDA marked "Life-Threatening (death has or could occur)."[23] In describing the "degree of the health hazard associated with use of the product by the population most at risk," the FDA marked "Life-Threatening (death has or could occur)."[24]

53. In July 2021, the FDA conducted a "Health Hazard Evaluation" on "Multiple Aerosol Sunscreen Products" manufactured by Johnson & Johnson.[25] The evaluation was requested following testing which showed benzene levels ranging "from 11.2 to 23.6 ppm" in Johnson & Johnson's aerosol sunscreen products. Specifically, the agency requested "an evaluation of the likelihood and risks associated with using aerosol sunscreens that contain benzene 11.2 to 23.6 ppm,"

---

[20] FDA's CDER Health Hazard Evaluation at 2 (April 18, 2018).

[21] *Id*. at 5.

[22] *Id*. at 6.

[23] *Id*. at 7.

[24] *Id*.

[25] CDER Health Hazard Evaluation, July 8, 2021, available at https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

which "levels exceed the guideline value provided by ICH [Q3C][26] and USP[27]" limits, states the report. The evaluation concluded that serious adverse effects, including potential for "life-threatening" issues or "permanent impairment of a body function" were "likely to occur" at exposure levels within that range. In addition, the evaluation stated that "individuals with altered skin absorption (i.e., infants, elderly, broken skin) and individuals who are exposed to benzene from other sources . . . may be at greater risk."

54. On July 13, 2021, the FDA communicated to Johnson & Johnson an addendum in which it quoted the ICH Q3C guidelines and further stating that "[t]he products under review are not considered drug products with significant therapeutic advance."[28]

55. One day later, on July 14, 2021, Johnson & Johnson voluntary recalled all lots of its Neutrogena and Aveeno aerosol sunscreen product lines.

56. In a subsequent letter to Johnson & Johnson dated September 23, 2021 related to the issuance of the voluntary recall of various sunscreen products because of the presence of benzene, the FDA reiterated its position that the presence of benzene at levels of 14.7 ppm and 23.4 ppm presents serious health hazards, stating:

> There is a reasonable probability that benzene present at levels determined by your firm in recalled product can result in cancers including leukemia and other types of blood cancers of the bone marrow, and blood disorders which can be life threatening.
>
> FDA has determined that this represents a serious health hazard which

---

[26] The International Conference on Harmonization Q3C Impurities: Residual Solvents guidance (December 1997), at https://www.fda.gov/media/71736/download?attachment.

[27] The term "USP" refers to United States Pharmacopeia (USP) Residual Solvents, at https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf.

[28] FDA Review Document at 2 (June 7, 2022).

may be life-threatening.[29]

Like acne treatment products, sunscreens are topical OTC drugs. Accordingly, the FDA's adoption of the 2 ppm guidance is not limited to a particular class of drugs, but is a general standard that it enforces for all topical OTC drugs.

57. Notably, Defendant's Products have been independently tested and shown to contain benzene at levels that vastly exceed those determined by the FDA to represent a serious health hazard which may be life-threatening.

58. Indeed, on December 27, 2023, in response to reports of benzene contamination in various drug products, the FDA published guidance on its website in the form of an "Alert," stating: "Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm[.]… If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]"[30] The FDA specifically recognized that benzene contamination in drugs can result from certain ingredients that "may yield benzene under certain conditions" and that the "formation of benzene from benzoate can lead to an increase in benzene content over a drug's shelf-life' and should be considered when determining the appropriate timing for benzene testing, e.g., testing at release and on stability (21 CFR 211.165, 211.166), and establishment of an appropriate expiration date (21 CFR 211.137)."[31]

59. The FDA's warnings are not unreasonable or unwarranted. "Even in trace amounts, benzene is known to pose a health risk from exposure routes that

[29] FDA Letter Regarding Voluntary Recall, September 23, 2021.

[30] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

[31] *Id.*

include inhalation, ingestion, dermal absorption, and skin or eye contact."[32]

60. The Environmental Protection Agency ("EPA") also recognizes the cancer risks of benzene, noting that "Benzene is classified as a 'known' human carcinogen (Category A) under the Risk Assessment Guidelines of 1986."[33] "[B]enzene is characterized as a known human carcinogen for all routes of exposure based on convincing human evidence as well as supporting evidence from animal studies."[34]

61. In a June 2022 review conducted by the FDA related to benzene in sunscreen products, the agency similarly stated: "Current scientific evidence demonstrates there is probably no safe level of exposure to benzene, as all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[35]

62. Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

63. The harm associated with benzene contamination in drugs is significant. Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.[36] The FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product due to its unacceptable toxicity effect.[37] But, where

[32] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.

[33] https://cfpub.epa.gov/ncea/iris2/chemicallanding.cfm?substance_nmbr=276.

[34] *Id.*

[35] FDA Review at 10 (June 7, 2022).

[36] Benzene, National Cancer Institute, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last updated Dec. 5, 2022).

[37] David Light et al., Valisure Citizen Petition on Benzene in Body Spray Products (Nov. 3, 2021), https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20

the use of benzene or other Class 1 solvents is ***unavoidable***, the FDA has stated that the levels should be restricted, and benzene is restricted under such guidance to 2 ppm.[38]

64. Benzene exposure from acne creams and gels are especially troubling because the creams and gels are applied directly onto the skin. Thus, even a relatively low concentration limit can result in very high total benzene exposure. Additionally, acne creams are often used by younger individuals, where the exposure can be more acute. Accordingly, benzene in amounts above 2 ppm render the Products unfit for their ordinary purpose.

65. All of this guidance leads to only one conclusion, that benzene should not be present in OTC drugs, even in the smallest amounts, unless absolutely unavoidable, due to the unacceptable risk serious health risks. Even when unavoidable benzene is restricted under such guidance to 2 ppm.

**C. BPO Is Unstable and Degrades into Benzene**

66. BPO is a diacyl peroxide with bacterial activity and is widely used as a treatment for acne. BPO, which is the active ingredient in Defendants' Products at issue, unavoidably degrades with enough time and heat to directly form benzene.[39]




FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf (the "Valisure Citizen Petition").

[38] Id.

[39] *See* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited March 8, 2024).

67. Benzene is created in Defendants' Products, because BPO has a known, inherent propensity to thermally decompose into two molecules of benzoic acid radicals that further decompose to benzene radicals with liberation of carbon dioxide. The benzene radicals then produce benze.

68. This process is accelerated by exposure to elevated temperatures equivalent to the temperature of hot cars/trucks/shipping containers or in improperly regulated manufacturing facilities.

69. However, this does not mean that all BPO-based acne treatments contain benzene in unacceptable amounts, if at all. Indeed, a 2024 study entitled "Evaluation of Benzene Presence and Formation in Benzoyl Peroxide Drug Products," in the Journal of Investigative Dermatology, tested 111 OTC BPO acne treatments. Each product was tested for native levels of benzene in unopened products stored at room temperature and sourced from six geographically distinct locations in the continental United States."[40] The Study found that "only 38 products, representing 34% of products tested, contained benzene above the conditionally restricted FDA limit of 2 ppm for benzene for drug product."[41] Additionally, the Study further found that:

> Regionality in sourcing did not appear to affect benzene concentration for same product or same lot. Similarly, the age of products as judged by years from labeled expiration does not appear to correlate with benzene concentration for the sampled products. This observation is anecdotal given the relatively small sample size. The results of the products sampled in this study suggest that formulation is likely the strongest contributor to benzene concentrations in BPO drug products that are commercially available because the magnitude of benzene detected correlates most closely with specific brands or product types within certain brands.[42]

[40] https://www.jidonline.org/action/showPdf?pii=S0022-202X%2824%2902155-9
[41] *Id.*
[42] *Id.*

Put differently, some brands are able to either formulate their BPO-based acne treatments or adopt proper manufacturing controls, to ensure that the BPO does not degrade into benzene during the manufacturing or holding process. But Defendants are not one of them.

70. The instability of BPO and its degradation into benzene has been studied in other applications, including in the polymer industry. Studies dated as early as 1994 have noted the connection between BPO and benzene. For the same reasons, various methods have been developed to reduce the degradation of BPO into benzene in these applications. For example, some antioxidants have been shown to reduce benzene formation by ninety-eight percent. In drug application, BPO can be stabilized to through "microencapsulation or micronization and suspension through polymeric mesh."[43]

71. Furthermore, benzene contamination is reduced, or even halted, when BPO is kept at lower temperatures.[44] But even short periods in higher temperatures will lead to increased benzene contamination. The "data suggests that about 9 ppm of benzene formed per day of incubation and that the concentration of benzene in the product reached 2 ppm within approximately 5 hours of incubation at 50°C [or 122°F]."[45] The key to ensuring safe BPO-based pharmaceuticals is ensuring that the BPO contained therein is stored and processed as the proper temperatures.

72. Additionally, due to the inherent risk of benzene contamination in BPO-based acne treatments, in process and finished product testing is required. Testing manufacturing inputs (such as the BPO in the Products), at key steps in the production process, as well as the finished product is necessary to ensure that the BPO has not improperly degraded. As noted by the FDA, this testing is required under CGMP standards to ensure that drug product batches that contains benzene

[43] *Id.*
[44] *Id.*
[45] *Id.*

above 2 ppm are not released.[46]

73. But Defendants' obligations do not end here. As the FDA has also noted that CGMP also includes requires testing to ensure that the Products are stable throughout their shelf-life: the "formation of benzene from benzoate can lead to an increase in benzene content over a drug's shelf-life' and should be considered when determining the appropriate timing for benzene testing, e.g., testing at release and on stability (21 CFR 211.165, 211.166), and establishment of an appropriate expiration date (21 CFR 211.137)."[47]

74. On information and belief, Defendants were aware of BPO's propensity to degrade into benzene. Indeed, the harms posed by BPO were known within scientific literature and were likely disclosed to Defendants when it sourced their BPO. Moreover, because drug manufacturers such as Defendant are held to the skill of an expert in the field, they must keep abreast of scientific advances. A reasonably prudent manufacturer is deemed to know of reliable information generally available or reasonably obtainable in the industry or in the particular field involved. As such, Defendant was aware of the established chemical processes that cause its BPO Products to contain benzene and/or degrade to form benzene when exposed to commonly used temperatures and conditions And if even they were not disclosed, any reasonable drug manufacturer would have discovered these issues during product development and sourcing of the ingredients, through normal quality control testing, or during shelf-life testing. Accordingly, Defendants' Products containing benzene as a natural and foreseeable result of the Products' formulation, distribution and handling, which is common to all consumers.

75. Nonetheless, Defendants did nothing to mitigate both the harms presented by benzene adulteration, as a result of BPO's decomposition. Defendants

---

[46] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

[47] *Id*.

did not change their formulation or manufacturing process, which would prevent degradation under normal circumstances that the Products may be used or stored. Additionally, Defendants did not do anything to ensure that the Products were manufactured or held in manner to prevent degradation of BPO into benzene. Nor did Defendants properly test their Products to ensure that they did not contain benzene in amounts which exceed federal guidelines.

76. Plaintiffs have information and belief that the benzene contamination within the Products is inherent to Defendants' manufacturing and holding processes, rendering all of the Products uniformly adulterated with benzene.

**D. Discovery of Benzene**

77. Defendants kept their benzene adulteration secret under wraps until March 6, 2024, when the pharmaceutical laboratory, Valisure LLC ("Valisure"), conducted independent tests, finding BPO acne treatment products are unstable and form benzene.[48]

78. Valisure LLC is an analytical laboratory and an online pharmacy known for its rigorous testing of medications and healthcare products to ensure their safety, quality, and consistency. Valisure is "accredited to International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238) [and] registered with the Drug Enforcement Administration (License # RV0484814)." Its core mission is "to help ensure the safety, quality and consistency of medications and supplements in the market."

79. Results from Valisure's tests show that on-market products can form over 800 times the conditionally restricted FDA concentration limit of 2 parts per million (ppm) for benzene after basic stability testing. High levels of benzene were not only detected inside BPO products, but also in the air around incubated BPO products, showing that benzene can leak out of some product packages and pose a

[48] https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited April 1, 2024).

potential inhalation risk. Incubation of BPO based acne treatment products at the temperature of a hot car (70°C) resulted in the detection of benzene in a compact car's volume of air at ~1,270 times the Environmental Protection Agency's ("EPA") calculated threshold for increased cancer risk by long-term inhalation exposure to benzene.

80. Valisure performed initial GC-MS analysis on 175 acne treatment products, 99 containing BPO and 76 containing other ingredients, most commonly salicylic acid or adapalene. All 76 non-BPO products had no detectable benzene or values below 2 ppm, and 94 of 99 BPO products contained benzene without any elevated temperature incubation. An initial stability study of 5 products using 37°C (98.6°F), 50°C (122°F), and 70°C (158°F) revealed that dozens of ppm of benzene can form in just a few weeks at 37°C, hundreds of ppm at 50°C, and at 70°C the apparent degradation of BPO would often lead product packaging to burst. Therefore, 50°C was chosen as a stability temperature for a broader study of 66 BPO containing products. In 18 days of stability testing at 50°C, Valisure detected over 1,500 ppm of benzene produced in 2 products, over 100 ppm in 17 products, and over 10 ppm in 42 products.

81. This stability testing is important. These tests are used to determine the expected shelf-life of the Product. Indeed, researchers use the metric 43 days at 70°C (158°F) as the 3-year accelerated stability equivalent. "This means that to achieve the expected minimum shelf life of 3 years for a standard pharmaceutical product, the product should exhibit stability for at least 43 days of 70°C incubation."[49]

82. The Valisure study found unacceptable levels of benzene (as 1700 ppm) in Defendants' 1700 ppm for the Proactiv 2.5% BPO Cream and over 400 ppm

[49] The Valisure Citizen Petition.

for Proactiv's 5.0% BPO Cream.[50]

83. Additionally, in a follow-on study, the authors of the Valisure Citizen Petition found that even when taken directly from the shelf, and tested, the Proactiv Products exceed the 2 ppm limit for Benzene.[51] Plaintiffs own independent testing supports Valisure's findings.

**E. The Products are Adulterated, Misbranded, and Illegal to Sell**

84. Throughout this Complaint, references to FDA regulations are merely to provide context and are not intended to raise a federal question of law. All claims alleged herein arise out of violations of state law, which in no way conflict, interfere with, or impose obligations that are materially different than those imposed by federal law.

85. Acne treatment products are "drug" products that are regulated by the U.S. Food and Drug Administration ("FDA"), pursuant to the federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq*., as well as analogous state statutes and regulations.

86. States have enacted laws adopting or mirroring the federal standards, making the sale of misbranded or adulterated drugs illegal:

- Illinois's Food, Drug and Cosmetic Act has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by 410 ILCS 620/14 is exactly the same as the FDCA.
- California's Sherman law also adopts FDCA's prohibition against the sale of adulterated drugs into California law. CAL. HEALTH & SAFETY CODE §§ 111295, 111250. *See also* CAL. HEALTH & SAFETY CODE § 110398 (even prohibiting the marketing and advertisement of

[50] *See* https://www.dermatologytimes.com/view/breaking-news-benzene-found-in-various-acne-products-valisure-files-petition-with-fda-to-recall-treatments (last visited April 1, 2024).

[51] https://www.jidonline.org/article/S0022-202X(24)02155-9/fulltext.

adulterated drugs).

- Missouri prohibits the adulteration and sale or offering of any adulterated drug. MO. REV. STAT. § 196.015.
- Nebraska defines "adulterated drug" as a drug that "differs from the standard of strength, quality, or purity as determined by the test laid down in The United States Pharmacopeia and The National Formulary." NEB. REV. STAT. §§ 71-246. Nebraska prohibits the adulteration and sale, possession or offering of any adulterated drug. NEB. REV. STAT. § 71-2481.

Accordingly, Defendants' acts represent an independent and separate violation of state law, prohibiting adulterated drugs.

a. <u>Benzene Renders the Products Adulterated, Misbranded, and Illegal to Sell</u>[52]

87. The FDCA prohibits the sale of adulterated or misbranded drugs. 21 U.S.C. §§ 351, 352.[53] Thus, to not have their BPO products be misbranded or adulterated, Defendants must use the specific language spelled out in the Acne Monograph on their BPO products, and they also must comply with the general

---

[52] Plaintiffs acknowledge that this Court has already ruled on, and rejected, this argument. The allegations in ¶¶ 87-92 exist solely to preserve the argument for appeal.

[53] The Acne Monograph explains that a BPO product "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this subpart and each general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.310(a). Thus, the Acne Monograph both specifies what language must be included on a BPO product label for it not to be misbranded (*see* 21 C.F.R. § 333.350 (listing required warnings)), and it also requires compliance with the general conditions in Section 330.1. Subsection 330.1 incorporates the general misbranding and adulteration requirements of the FDCA, by requiring that "[t]he product [be] labeled in compliance with chapter V of the [FDCA]" and that "[a]n OTC drug product that is not in compliance with chapter V … is subject to regulatory action." 21 C.F.R. § 330.1(c)(1). Critically, Chapter V of the FDCA proscribes the sale of misbranded and adulterated drugs. 21 U.S.C. §§ 351, 352.

safety requirements spelled out in 21 U.S.C. section 351 and 352. States have enacted laws adopting or mirroring these federal standards.

88. A drug is adulterated "[i]f it consists in whole or in part of any filthy, putrid, or decomposed substance . . . ." 21 U.S.C. § 351(a). The FDA classifies benzene as a Class 1 solvent due to it being a known carcinogen, and instructs that it "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect."[54] Regarding adulteration, the products degrade into benzene during regular use, violating the FDCA's prohibition on selling adulterated drugs. Contrary to the District Court's conclusion, the FDCA prohibits adulteration at any stage of a product's lifecycle, not just at the point of manufacture or initial sale.

89. Defendants' Products are adulterated because they contain benzene, which is a degradant of the product's active ingredient BPO—a degradant that exists at the point of manufacture and increases both during regular storage and transport and while the consumer uses the product in reasonable and foreseeable ways.

90. A drug is misbranded if the label is "false or misleading in any particular." 21 U.S.C. § 352(a)(1). This includes failing "to reveal facts material … which may result from the use of the article under such conditions of use as are customary or usual," or including a component "dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. §§ 321(n) & 352(j). Concealing carcinogenic byproducts renders a label misbranded under the FDCA, because it is false or misleading.

91. Defendants' products degrade into benzene during regular use. So, although such a warning may not be expressly required by the Acne Monograph, it is required by 21 U.S.C. Section 352, because failure to do so would render a BPO

[54] U.S. Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (June 2017), https://www.fda.gov/media/71737/download.

label false and misleading and, thus, misbranded.

92. Thus, the presence of benzene, a known carcinogen, renders Defendants' Products both adulterated and misbranded under the Acne Monograph and the FDCA's general labeling and safety provisions.

b. The Products do not Compel with CGMP Rendering the Products Adulterated, Misbranded, and Illegal to Sell

93. As OTC drug products regulated by the FDA, the Products also must be both safe and effective and are subject to federal current CGMP regulations and the FDCA's state law analogues. These CGMP regulations require OTC medications like the Products to meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B).

94. The CGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." 21 C.F.R. § 210.1(a). In other words, manufacturers, like Defendants, at all phases of the design, manufacture, and distribution chain are bound by these requirements.

95. The CGMPs set forth minimum standards regarding organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug product containers and closures (Subpart E); production and process controls (Subpart F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K). The FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

96. Any drug product not manufactured in accordance with CGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the

United States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

97. FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

98. FDA regulations similarly provide that manufacturers follow the responsibilities and procedures applicable to the quality control unit by retesting or reexamining drug components for identity, quality and purity, including "(e.g. after storage for long periods of time or after exposure to air, heat or other conditions that might adversely affect the components….). 21 C.F.R. § 211.87.

99. A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160.

100. "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a)(6). This includes testing at release of the product to determine the satisfactory conformance to final specifications for the drug product (21 CFR § 211.165) and to ensure the stability characteristics of drug products and establishment of an appropriate expiration date (21 CFR §§ 211.166, 211.137).

101. Put differently, Defendants must have scientifically sound

specifications and must have test procedures and processes to ensure the drug's components (active and inactive ingredients), and finished products are safe, including after "exposure to air, heat, or other conditions that might adversely affect" drug components. 21 C.F.R. § 211.87. Both raw ingredient materials and finished batches must be tested before released to the public to confirm they meet specifications for identity, strength, quality, and purity. 21 C.F.R. § 211.84, *see also* 21 C.F.R. § 211.160. If testing results of the raw materials or finished product do not conform with the specifications, the product cannot be sold to the public. Defendants must also re-test any Products subject to deterioration. 21 C.F.R. § 211.87.

102. FDA guidance permits up to 2 ppm benzene in a pharmaceutical product if its use in the manufacturing process is "unavoidable."[55] Benzene is not a necessity, or even intended, part of the Product's manufacturing process. Given the long history and widespread use of acne products without any benzene contamination, the use of benzene in the Products is not "unavoidable." But regardless, Defendants' Products contain levels of benzene well above 2 ppm. Therefore, Defendants' Products could not possibly meet the CGMP testing requirements, as they would not have been released if properly tested.

103. Additionally, a drug is deemed adulterated if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice [('CGMP')] . . . ."[56] CGMP regulations require that "[a]ny building or buildings used in the manufacture, processing, packing, or holding of a drug product shall be of suitable size, construction and location to facilitate cleaning, maintenance, and proper operations." 21 C.F.R. § 211.42. This includes, when warehousing drug products, to have adequate written procedures, which are followed, to ensure the "[s]torage of drug products under appropriate conditions of

[55] *Valisure Citizen Petition*, *supra*.

[56] 21 U.S.C. § 351(a)(2)(B) (emphasis added).

temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products are not affected." 21 C.F.R. § 211.142(b).

104. Indeed, the FDA warns drug manufacturers that:

> Drug products that have been subjected to improper storage conditions (including extremes in temperature, humidity, smoke, fumes, pressure, age, or radiation) due, for example, to natural disasters, fires, accidents, or equipment failures shall not be salvaged and returned to the marketplace. Such exposure can pose a serious risk to a drug's identity, strength, quality, purity or safety (see 21 CFR 211.208). This fundamental CGMP principle applies to any component, in-process material, or finished drug product subjected to such conditions. In some cases, there may be substantial and reasonable uncertainty whether a drug was subjected to these conditions. In such a circumstance, it is essential that a firm nonetheless err on the side of caution in its risk assessment to ensure an appropriate lot disposition decision… .[57]

Simply put, any risk that an OTC drug was stored or manufactured at improper temperatures means Defendants should not have allowed the Products to be on the shelves and certainly should not have sold them to customers.

105. Whether during the manufacturing or holding process, the Products should not have become adulterated with benzene. The presence of benzene above 2 ppm—which, upon information and belief, resulted from Defendants' failure to comply with CGMPs—renders the Products both adulterated under the FDCA. The Products are adulterated because they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(1).

106. Indeed, the mechanism by which BPO degrades into benzene is known

---

[57] FDA, *Questions and Answers on Current Good Manufacturing Practice Requirements | Returned and Salvaged Drug Products*, https://www.fda.gov/drugs/pharmaceutical-quality-resources/questions-and-answers-current-good-manufacturing-practice-requirements-returned-and-salvaged-drug#1.

(high temperatures). Had the manufacturing inputs, manufacturing, and holding process been conducted within acceptable temperatures, it is unlikely that any benzene would be present in the Products. Accordingly, Defendants violated the CGMP by not manufacturing or holding the Products under acceptable conditions.

107. Defendants also knew, or should have been aware, that the Products were adulterated. Defendants must also do stability testing to understand the "shelf life" of the Products and to assign an expiration date. It is well known that certain chemical ingredients can degrade or change because of environmental, and storage conditions such as light, moisture, temperature, and humidity, or because of the passage of time. The stability testing should cover all expected distributor and consumer storage, handling, and use conditions and must be done using "reliable, meaningful, and specific test methods."[58] If any stability testing finds that a Product is not stable under expected storage or use conditions, degrades, or create toxic byproducts, the Product cannot be sold to the public.

108. Here, stability testing found that Defendants' formulation of the Products is unable to ensure that the Products do not contain unacceptable levels of benzene through their normal shelf-life. This is an additional violation of the CGMP.

109. Indeed, in 2022, the FDA issued a safety alert warning drug manufacturers of the risk of benzene contamination in certain drug products and drug components. The FDA reiterated the risk benzene exposure poses to public health and the drug manufacturers' obligations to test drug products under the U.S. Code of Federal Regulations, Title 21:

> FDA reminds manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate quality specifications (21 C.F.R. 211.84, 21 C.F.R. 211.160). This includes testing of raw materials and finished batches (21 C.F.R. 211.165) prior to release to ensure they

[58] 21 CFR § 211.166.

meet appropriate specifications for identity, strength, quality, and purity.[59]

110. The FDA warned drug manufacturers that any drug products or components at risk of benzene contamination should be tested, and any batches with benzene above 2 ppm should not be released to the public.[60]

111. A product that is "adulterated" cannot legally be manufactured, advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless. The FDA warned that, if any drug or drug component was subject to deterioration, drug manufacturers must have re-testing procedures in place to ensure continued purity and stability. The FDA recommended risk assessments to evaluate the possibility of benzene contamination in the drug products or components.[61] If any drug product in circulation was found to have benzene over 2ppm, the FDA directed that drug manufacturers contact the FDA to discuss a voluntarily recall.[62]

112. Despite the known scientific research regarding BPO degradation, warnings from the FDA, and CGMP regulations which require product testing, Defendants still allowed adulterated Products onto the market and did not issue a recall when testing demonstrated that the Products contained Benzene.

113. As alleged herein, Defendants have violated the FDCA, and independently violated the parallel state laws, as well as state consumer protection statutes and the UCC implied warranty provisions. Defendants represented that the Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

---

[59] Federal Drug Administration, *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs* (Dec. 22, 2022) (available at https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs).

[60] *Id*.

[61] *Id*.

[62] *Id*.

114. Had consumers, including Plaintiffs, known that the Products were adulterated, they would not have purchased them, or paid less. Defendants do not disclose that the Products contained and/or degraded to form benzene in amounts that exceed federal guidelines and does not comply with CGMP regulations. Additionally, as a seller of an OTC drug product, Defendants have and had a duty to ensure that their Products did not and do not contain excessive levels of benzene, including through regular testing, especially before injecting the Products into the stream of commerce for consumers to use on their bodies. But based on Valisure's testing results, Defendants made no reasonable effort to test their Products for benzene or other impurities.

**F. Injuries to Plaintiffs and Class Members**

115. When Plaintiffs purchased Defendants' Products, Plaintiffs did not know, and had no reason to know, that Defendants' Products contained or risked containing the harmful carcinogen benzene because they were not held or manufactured in accordance with CGMP. Not only would Plaintiffs not have purchased Defendants' Products had they known the Products contained benzene levels that exceed federal guidelines and were not held or manufactured in accordance with CGMP, but Plaintiffs would also not have been capable of purchasing them. Nor are Plaintiffs able to determine if the Products had been held and manufactured in accordance with Defendants' obligations under CGMP because such activities are solely in the control of Defendants and are not visible to the consuming public.

116. Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and rely on Defendants to ensure that the Products are not adulterated by complying with the CGMP.

117. Further, given Defendants' position as a retail industry leader, Plaintiffs and reasonable consumers trusted and relied on Defendants' representations and

omissions regarding the Products, that they were being legally sold as OTC drugs, complying the FDA standards required of such products.

118. No reasonable consumer would have paid any amount for products containing benzene, much less above the limits set by the FDA (even assuming those allowances apply to Defendants' Products) or that did not comply with the CGMP.

119. Thus, if Plaintiffs and Class Members knew that Defendants' Products contained unlawful levels of benzene and did not comply with the CGMP, they would not have purchased or used the Products, or would have paid significantly less for the Products.

120. Plaintiffs and Class Members bargained for acne products free of contaminants and dangerous substances, and that were properly and legally sold as OTC drugs. Defendants' failure to comply with the CGMP requirements, or providing OTC drugs that exceed federal or international benzene guidelines for pharmaceutical products, renders the Products unmerchantable. Plaintiffs and Class Members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene and did not comply with CGMP requirements Alternatively, Plaintiffs are entitled to the difference between the adulterated Products purchased and as warranted.

121. Plaintiffs and Class Members are further entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

## V. CLASS ACTION ALLEGATIONS

122. Plaintiffs seek to represent a nationwide class defined as:

> All persons in the United States who purchased the Products for personal or household use within any applicable limitations period (the "Class").

Additionally, or in the alternative, the Plaintiffs seek to represent individual subclasses:

> The "Illinois Subclass"
> All persons who purchased the purchased the Products in Illinois for personal

or household use within any applicable limitations period.

The "California Subclass"
All persons who purchased the purchased the Products in California for personal or household use within any applicable limitations period.

The "Missouri Subclass"
All persons who purchased the purchased the Products in Missouri for personal or household use within any applicable limitations period.

The "Nebraska Subclass"
All persons who purchased the purchased the Products in Nebraska for personal or household use within any applicable limitations period.

Specifically excluded from the Class and Subclasses are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

123. The Class and Subclasses are collectively referred to as the "Classes."

124. Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

125. The Classes are suitable for Class Certification under Rule 23(b)(3).

126. **Numerosity.** The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise numbers of proposed members are unknown to Plaintiff, the true numbers of members of the Classes are known by Defendants. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution and sales records of Defendants and third-party retailers and vendors.

127. **Typicality.** The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all members of the Classes, purchased the Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity. The representative Plaintiffs, like all members of the Classes, have been damaged by Defendants' misconduct in the very same way as the members of the Classes. Further, the factual bases of Defendants' misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

128. Existence and predominance of common questions of law and fact. Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes. These common legal and factual questions include, but are not limited to, the following:

(a) whether the Products contain benzene in an amount that exceeds the federal guidelines;

(b) whether Defendants violate the CGMP;

(c) whether Defendants knew or should have known the Products contained benzene;

(d) whether Defendants are liable to Plaintiffs and the Classes for unjust enrichment;

(e) whether Defendants violated the state consumer protection statutes alleged herein;

(f) whether Defendants breached the implied warranty of merchantability;

(g) whether Plaintiffs and the Classes have sustained monetary loss and the proper measure of that loss;

(h) whether the presence of benzene in the Products renders the Products adulterated; and

(i) whether Plaintiffs and the Classes are entitled to damages, restitution, and/or disgorgement from Defendants.

129. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes. Plaintiffs have no interests that are antagonistic to those of the Classes.

130. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of her claims against Defendants. It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

131. In the alternative, the Classes may be certified under Rule 23(b)(2) and (4) because:

(a) the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendants;

(b) the prosecution of separate actions by individual members of the

Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c) Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole

## VI. CAUSES OF ACTION

### COUNT I
### Violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act 815 ILCS 505/1, *et seq.*
### (On Behalf of Plaintiff O'Dea and the Illinois Subclass)

132. Plaintiff O'Dea incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

133. Plaintiff O'Dea brings this claim individually and on behalf of the members of the proposed Illinois Subclass against Defendants.

134. Plaintiff O'Dea and other Illinois Subclass Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

135. Defendants are a person within the context of the ICFA, 815 ILCS 505/1(c).

136. At all times relevant hereto, Defendants were engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

137. Plaintiff O'Dea and the proposed Illinois Subclass are "consumers" who purchased the Products for personal, family or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

138. The ICFA does not apply to "[a]ctions or transactions specifically

authorized by laws administered by any regulatory body or officer of this State or the United States." 815 ILCS 505/10b(1).

139. The FDCA prohibits introduction into interstate commerce "of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

140. As the Products are adulterated and misbranded, the FDCA specifically prohibits their introduction into interstate commerce, and thus, actions under the ICFA related to the Products being adulterated and misbranded are not barred by 815 ILCS 505/10b(1).

141. The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce." ICFA, 815 ILCS 505/2.

142. The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

143. Plaintiff O'Dea and the other Illinois Subclass Members reasonably relied upon Defendants' representation that the Products can be legally sold as OTC drugs and complied with the relevant CGMP regulations. By placing the Products on the marketing, Defendants marketed the Products as legal drugs.

144. Defendants' conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq.*

145. Defendants engaged in unfair conduct in violation of the ICFA, including but not limited to selling adulterated products in violation of the FDCA and IL FDCA.

146. Defendants engaged in deceptive conduct, including but not limited to misrepresenting that the Products could be lawfully sold, as OTC drugs, complying

with the relevant CGMPs, when they were adulterated.

147. Defendants violated the ICFA by representing that the Products have characteristics or benefits that they do not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

148. Defendants engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

149. Prior to placing the Products into the stream of commerce and into the hands of consumers to use on their bodies, Defendants knew or should have known that the Products contained benzene, but Defendants not only failed to properly test and quality-check their Products and knowingly placed adulterated products on the market.

150. Defendants intended that Plaintiff O'Dea and each of the other Illinois Subclass Members would reasonably rely upon these misleading characterizations, warranties and material omissions concerning the true nature of the Products.

151. Given Defendants' position in the health, skincare, and beauty market as an industry leader, Plaintiff O'Dea and reasonable consumers trusted and relied on Defendants' representations and omissions regarding the legality and adulterated nature of the Products.

152. Defendants' misrepresentations, concealment, and other deceptive conduct were likely to cause misunderstanding and/or in fact caused Plaintiff O'Dea and each of the other Illinois Subclass Members to be deceived about the true nature of the Products.

153. Plaintiff O'Dea and Illinois Subclass Members have been damaged as a proximate result of Defendants' unfair and deceptive violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products.

154. As a direct and proximate result of Defendants' violations of the ICFA, as set forth above, Plaintiff O'Dea and the Illinois Subclass Members have suffered

ascertainable losses of money caused by Defendants' unfair conduct of selling adulterated, misbranded, and illegally sold Products.

155. Had they been aware of the true nature of the Products, Plaintiff O'Dea and the Illinois Subclass Members either would have paid less for the Products or would not have purchased them at all.

156. Based on Defendants' unfair and/or deceptive acts or practices, Plaintiff O'Dea and the Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs, and attorneys' fees, under 815 ILCS 505/10a.

**COUNT II**
**Violations of the Consumers Legal Remedies Act (the "CLRA"), CAL. CIV. CODE § 1750, *et seq.***
**(On Behalf of Plaintiffs Teron, Ramos, Cross, and Scharon and the California Subclass)**

157. Plaintiffs Teron, Ramos, Cross, and Scharon incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

158. Plaintiffs Teron, Ramos, Cross, and Scharon bring this cause of action on behalf of themselves, and the California subclass members, all of whom are similarly situated consumers within the meaning of CAL. CIV. CODE § 1781.

159. Defendants' acts violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*., enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendants. Defendants regularly transact business in California, including in this District, and has engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California, and in this District.

160. California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*. prohibits unfair methods of competition and unfair or deceptive acts or practices in connection with the sale of consumer goods. Defendants violated several prohibitions of CAL. CIV. CODE § 1750(a).

161. Defendants violated CAL. CIV. CODE § 1750(a)(2), (5), and (9) by representing the source, sponsorship, and approval, of the Products by representing that Defendants met their obligations to conduct adequate and meaningful quality and safety testing before selling the Products to the public and the Products were not adulterated, therefore legal to sell.

162. Defendants violated CAL. CIV. CODE § 1750(a)(6) and (7) by misrepresenting that the Products could be lawfully sold, as OTC drugs, complying with the relevant CGMPs, when they were adulterated.

163. Defendants' acts, omissions, and concealment of material health and safety information are ongoing and continue to cause harm. Defendants continue to market, advertise, and sell the Products to the public, even though they are adulterated with benzene and do not comply with the CGMP regulations. Further, Defendants continue to market itself as a responsible drug manufacturer and seller who sells safe and legal products when they have not quantified the levels of benzene contained in and/or created in the Products during normal and expected storage conditions.

164. Defendants engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs Teron, Ramos, Cross, and Scharon and the California subclass members, and not outweighed by any benefit. Omitting and/or concealing material human health and safety information and that the Products are adulterated (and therefore cannot be legally sold) is unethical, unscrupulous, and offensive.

165. Plaintiffs Teron, Ramos, Cross, and Scharon and the California subclass members suffered ascertainable economic losses as a result of Defendants' misconduct because they bought Products they would not have otherwise bought, or paid less for them. Indeed, it was unlikely that the Products would have been sold, as they were adulterated, that the truth been known.

166. Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiffs Teron,

Ramos, Cross, and Scharon, through counsel, mailed Defendants a letter by certified mail addressed to their headquarters (with a copy sent to Defendants' counsel as well), providing notice of Defendants' alleged violations of the CLRA, demanding that Defendants correct such violations, and providing Defendants with the opportunity to correct their business practices. Plaintiffs specifically identified which provisions of Cal. Civ. Code § 1770 Defendants had violated. Defendants have not corrected their violations for the CLRA.

167. Pursuant to California Civil Code § 1780, Plaintiffs Teron, Ramos, Cross, and Scharon seeks injunctive relief, their reasonable attorneys' fees and costs, damages, restitution, and any other relief that the Court deems proper.

## COUNT III
## Violations of the Unfair Competition Law (the "UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq.*
## (On Behalf of Plaintiffs Teron, Ramos, Cross, and Scharon and the California Subclass)

168. Plaintiffs Teron, Ramos, Cross, and Scharon incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

169. Plaintiffs Teron, Ramos, Cross, and Scharon bring this cause of action on behalf of themselves, and all members of the California Subclass, all of whom are similarly situated consumers.

170. California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq*., prohibits "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or misleading advertising." Defendants regularly transact business in California, including in this District, and has engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California, and in this District.

171. Defendants misrepresented their Products in advertising, labels, and containers and misled Plaintiffs Teron, Ramos, Cross, and Scharon, the California Subclass, and the public about the ingredients, characteristics, purity, quality,

approval, and safety of the Products. Defendants led Plaintiffs Teron, Ramos, Cross, and Scharon, the California subclass, and the public to believe the Products were safe, legal to sell, and had characteristics, purity, and quality that the Products did not have.

172. Defendants engaged in deceptive conduct, including but not limited to misrepresenting that the Products could be lawful sold, as OTC drugs, complying with the relevant CGMPs, when they were adulterated.

173. Defendants omitted material information when misrepresenting that the Products were legal to sell as OTC drugs, when they were actually adulterated.

174. Defendants' acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect that Defendants' Products are legal sold as OTC drugs and are not adulterated.

175. Had Defendants been truthful in their advertising, labeling, packaging, and online statements about benzene in the Products, or the risk that such Products would degrade into benzene, rendering the Products adulterated, and illegal to sell, Plaintiffs Teron, Ramos, Cross, and Scharon and the California Subclass members would not have bought the Products, or paid less for them.

176. Defendants' acts, omissions, and/or concealment of material health and safety information are ongoing and continuing to cause harm. Defendants continued to market, advertise, and sell the Products to the public without telling the public about benzene in the Products and/or their violations of the CGMP, which rendered the Products illegal to sell.

177. Additionally, Defendants' acts are unlawful, as they violate the Sherman law, as well as the FDCA, as alleged herein. Defendants do not comply with CGMP regulations and sell adulterated products. Defendants' actions also violate the CLRA.

178. Defendants' actions are also unfair. Defendants engaged in these illegal practices for significant financial gain, which are unlawful and violate state and

federal drug laws, are unreasonably dangerous to Plaintiffs Teron, Ramos, Cross, and Scharon and the California Subclass members, and not outweighed by any benefit. Marketing adulterated drugs, and failing to comply with CGMP regulations in a systematic manner, is unethical, unscrupulous, and offensive.

179. Plaintiffs Teron, Ramos, Cross, and Scharon seek an order enjoining Defendants from continuing to conduct business through unlawful acts and practices.

180. Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiffs Teron, Ramos, Cross, and Scharon's desire to purchase the Products in the future if they can be assured that the Products are properly label and do not contain benzene.

181. Plaintiffs Teron, Ramos, Cross, and Scharon seek restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiffs and the Subclass. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

182. On behalf of themselves and the California Subclass, Plaintiffs Teron, Ramos, Cross, and Scharon also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

## COUNT IV

**Violation of the Missouri Merchandising Practices Act (the "MMPA"), MO. REV. STAT. § 407.010, *et seq.***
**(On Behalf of Plaintiffs Benett, Heermann, Jackson, and Scroggs and the Missouri Subclass)**

183. Plaintiffs Benett, Heermann, Jackson, and Scroggs incorporate by reference the allegations contained in the paragraphs above as if fully set forth

herein.

184. The acts and practices engaged in by Defendants, and described herein, constitute unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act, MO. REV. STAT. § 407.010, *et seq*.

185. Defendants engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution or advertisement of the Products, in violation of MO. REV. STAT. § 407.020.

186. Defendants engaged in deceptive conduct, including but not limited to misrepresenting that the Products could be lawful sold, as OTC drugs, complying with the relevant CGMPs, when they were adulterated.

187. Plaintiffs Benett, Heermann, Jackson, and Scroggs and the putative Missouri Subclass members purchased the Products, Products that were falsely represented, as stated above, which were adulterated in violation of Federal law, and as a result, Plaintiffs and the putative Class members suffered economic damages in that the Products were worth less than the product they thought they had purchased had Defendants' representations been true.

188. On behalf of themselves and the Missouri Subclass, Plaintiffs Benett, Heermann, Jackson, and Scroggs seek damages.

**COUNT V**
**Violation of the Nebraska Consumer Protection Act (the "NCPA"), NEB. REV. STAT. §§ 59-1601, *et seq.***
**(On Behalf of Plaintiff Judt and the Nebraska Subclass)**

189. Plaintiff Judt incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

190. Defendants, Plaintiffs, and Class Members all are persons within the meaning of the Nebraska Consumer Protection Act. NEB. REV. STAT. §§ 59-1601(1).

191. Defendants engage in "trade" and "commerce" by selling the Products,

directly or indirectly, within Nebraska. NEB. REV. STAT. §§ 59-1601(2).

192. The Nebraska Act makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. Ann. § 59-1602.

193. Defendants misrepresented their Products in advertising, labels, and containers and misled Plaintiff Judt, the Nebraska Subclass, and the public about the ingredients, characteristics, purity, quality, approval, and safety of the Products. Defendants led Plaintiff Judt, the Nebraska Subclass, and the public to believe the Products were safe, legal to sell, and had characteristics, purity, and quality that the Products did not have.

194. Defendants engaged in deceptive conduct, including but not limited to misrepresenting that the Products could be lawful sold, as OTC drugs, complying with the relevant CGMPs, when they were adulterated.

195. Defendants omitted material information when misrepresenting that the Products were legal to sell as OTC drugs, when they were actually adulterated.

196. Defendants' acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect that Defendants' Products are legal sold as OTC drugs and are not adulterated.

197. Had Defendants been truthful in their advertising, labeling, packaging, and online statements about benzene in the Products, or the risk that such Products degraded into benzene and did not comply with CGMP standards, rendering the Products adulterated, and illegal to sell, Plaintiff Judt and the Nebraska Subclass members would not have bought the Products, or paid less for them.

198. Additionally, Defendants' acts are unlawful, under the FDCA, as alleged herein. Defendants do not comply with CGMP regulations and sell adulterated products.

199. Defendants' actions are also unfair. Defendants engaged in these illegal practices for significant financial gain, which are unlawful and violate federal drug

laws, are unreasonably dangerous to Plaintiff Judt and the Nebraska Subclass members and not outweighed by any benefit. Marketing adulterated drugs and failing to comply with CGMP regulations in a systematic manner, is unethical, unscrupulous, and offensive.

200. Accordingly, Plaintiff Judt and the Nebraska Subclass members seek damages, costs and reasonable attorney fees. Additionally, Plaintiff Judt and the Nebraska Subclass seek injunctive relief to end Defendants' unlawful practices.

**COUNT VI**
**Breach of Implied Warranty of Merchantability**
**(On Behalf of Plaintiffs and the Classes)**

201. Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

202. Plaintiffs bring this cause of action individually and on behalf of (1) all consumers who purchased Products directly from Defendants (for which there is privity), (2) all consumers who whose state law has abrogated the privity requirement for implied warranty of merchantability claims seeking economic loss, and (3) all California, Missouri, Massachusetts, Nebraska, and Pennsylvania Subclass members.

203. Defendants impliedly warranted that their Products were merchantable, fit, and safe for ordinary use.

204. Under the UCC, which has been uniformly adopted in all states but Louisiana, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." UCC § 2-314(1).

205. Defendants are a "merchant" for the purposes of UCC § 2-314.

206. The Products were goods under UCC 2-105(1).

207. To be merchantable the goods, among other things, must be (1) "fit for the ordinary purposes for which such goods are used" and (2) "pass without

objection in the trade under the contract description[.]" UCC § 2-314(2)(a), (c). Defendants have violated these implied warranties.

208. First, the Products contain benzene, including at levels that exceed the FDA's and ICH's guidelines for benzene in pharmaceutical products, they are not fit for the ordinary purposes for which such Products are used. Nor are they of merchantable quality because they do not pass without objection in the trade under the contract description.

209. Second, the Products were not manufactured and held in accordance with CGMP standards. Thus, they are not fit for the ordinary purposes for which such Products are used. Nor are they of merchantable quality because they do not pass without objection in the trade under the contract description.

210. Indeed, the levels of benzene contained in the Products has been indisputably linked to negative health consequences.

211. Plaintiffs and members of the class purchased the Products in reliance upon the fact that the Products were merchantable, fit, and safe for ordinary use for which they were sold. They were not. The defect in the Products (*i.e.* the presence of benzene and CGMP violations) render the Products unfit for human use or application as an acne treatment product.

212. Moreover, the Products were not altered by Plaintiffs or members of the class; Plaintiffs and members of the class were foreseeable users of the Products; and Plaintiffs and members of the class used the Products in the manner intended.

213. Contrary to Defendants' implied warranties, the Products were defective, unmerchantable, and unfit for their ordinary use when sold.

214. By reason thereof, Plaintiffs and the other class members have suffered damages in an amount to be proven at trial. The damages are equal to the difference between the price of the Product warranted and the adulterated Product delivered. Given that adulterated Product cannot be legally sold, they likely had no value, and the damages would, therefore, be the full purchase price of the Products.

**COUNT VII**
**Negligent Misrepresentation/Omission**
**(On Behalf of Plaintiffs and the Classes)**

215. Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

216. Through their labeling and advertising, Defendants made representations to the Plaintiffs and the class members concerning the quality, safety, and purity characteristics of their Products.

217. Defendants have a common law duty to provide accurate and non-misleading information to consumers with respect to the quality, safety, and purity characteristics of its Products, including defects, and to not omit such material quality, safety, and purity characteristic information. More specifically, Defendants have the duty and obligation not to sell products that were adulterated with benzene or that did not comply with CGMP standards. This duty existed independently from any contractual obligations between the parties.

218. As a manufacturer, Defendants also have a common law duty (and a duty under appliable drug safety laws) to use reasonable care in the design and manufacture of their Products, including the duty to perform reasonable tests and inspections of their Products to discover latent defects (such as the presence of benzene). This duty existed independently from any contractual obligations between the parties.

219. Defendants breached their duty to perform reasonable tests and inspections of their Products for latent defects (*i.e.* the presence of benzene) prior to selling those Products to consumers.

220. Plaintiffs and the other class and subclass members reasonably relied on Defendants' representations that the Products were OTC drugs, which could be legally sold as such. Because of the presence of Benzene in amounts above 2 ppm and Defendants' violations of the CGMP, the Products were not legally marketed

OTC drugs and should not have been represented as such.

221. Moreover, Plaintiffs were foreseeable victims of Defendants' misconduct. Defendants knew or should have known that manufacturing and selling Products containing benzene rendered the Products adulterated and/or misbranded under state law and, thus, illegal to sell, and that Plaintiffs would suffer the very financial loss which ultimately occurred.

222. Defendants' breaches of their duties were a direct and proximate cause of the economic harms to Plaintiffs and Class members.

223. By reason thereof, Plaintiffs and the other class and subclass members have suffered damages in an amount to be proven at trial

**COUNT VIII**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**

224. Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

225. Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendants, in the alternative to their legal claims.

226. Plaintiffs and the Classes conferred a benefit on Defendants in the form of monies paid to purchase Defendants' defective and worthless Products.

227. Defendants voluntarily accepted and retained this benefit.

228. Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use and adulterated, it would be unjust and inequitable for Defendants to retain the benefit without paying the value thereof.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendants as follows:

(a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as the representative for the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendants' conduct violates the causes of action referenced herein;

(c) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) Awarding pre-judgment and post-judgment interest;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Respectfully submitted,

DATED: January 24, 2025

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**

By: /s/ Trenton Kashima

Trenton Kashima (SBN No. 291405)
Alex R. Strauss (SBN No. 321366)
280 S. Beverly Drive, Ste. PH
Beverly Hills, CA 90212
Telephone: (619) 910-7047
tkashima@milberg.com
astraus@milberg.com

Nick Suciu, III*
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Facsimile: (865) 522-0049
nsuciu@milberg.com

J. Hunter Bryson*
405 East 50th Street
New York, NY 10022
Telephone: (202) 640-1167
hbryson@milberg.com

Luis Angel Cardona*
1311 Ponce De Leon Avenue
San Juan, PR 00985
Telephone: (516) 862-0194
lcardona@milberg.com

Russell Busch*
227 West Monroe Street, Suite 1100
Chicago, IL 60606
Telephone: (630) 796-0903
rbusch@milberg.com

*admitted *pro hac vice*

*Attorneys for Plaintiff Lucinda O'Dea and the Proposed Class*

Dated: January 24, 2025

**BURSOR AND FISHER P.A.**

Philip L. Fraietta (SBN No. 6337165)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646)-837-7150
pfraietta@bursor.com

*Attorney for Plaintiff Lucinda O'Dea and the Proposed Class*

Dated: January 24, 2025

**AYLSTOCK, WITKIN, KREIS, & OVERHOLTZ PLLC**

By: /s/ R. Jason Richards
R. Jason Richards (*pro hac vice*)
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-mail: jrichards@awkolaw.com

*Attorney for Plaintiffs Teron, Heermann, Jackson, Scroggs and the Proposed Class*

Dated: January 24, 2025

**WISNER BAUM LLP**

By: /s/ Stephanie Sherman
Stephanie Sherman, Esq. (SBN: 338390)
R. Brent Wisner, Esq. (SBN: 276023)
11111 Santa Monica Blvd, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444
ssherman@wisnerbaum.com
rbwisner@wisnerbaum.com

*Attorneys for Plaintiffs Efren Ramos, Joshua Cross, Marisol Scharon and the Proposed Class*

Dated: January 24, 2025

**LEVI & KORSINSKY, LLP**

By: /s/ Mark S. Reich
Mark S. Reich*
Courtney E. Maccarone*
Melissa Meyer*
33 Whitehall Street, 17th Floor
New York, NY 10006
Tel: 212-363-7500
Fax: 212-363-7171
mreich@zlk.com
cmaccarone@zlk.com
mmeyer@zlk.com

*admitted *pro hac vice*

*Attorneys for Plaintiff Jordan Judt and the Proposed Class*

Dated: January 24, 2025

**WAGSTAFF & CARTMELL LLP**

By: /s/ Thomas P. Cartmell
Thomas P. Cartmell*
Melody R. Dickson*
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 701-1100
Fax: (816) 531-2372
tcarmell@wcllp.com
mdickson@wcllp.com

*admitted *pro hac vice*

*Attorneys for Plaintiffs Jamie Heermann, Bianca Jackson, Cole Scroggs and the Proposed Class*

Dated: January 24, 2025

**BRADLEY GROMBACHER LLP**

/s/ Kiley Lynn Grombacher
Kiley Lynn Grombacher (SBN No. 245960)
31365 Oak Creek Drive, Suite 240
Westlake Village, CA 91361
Tel: (805) 270-7100
kgrombacher@bradleygrombacher.com

*Attorney for Plaintiffs George Teron, Jamie Heermann, Bianca Jackson, Cole Scroggs and the Proposed Class*